D. EDWARD HAYS, #162507
ehays@marshackhays.com
AARON E. DE LEEST, #216832
adeleest@marshackhays.com
CHAD V. HAES, #267221
chaes@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Richard A. Marshack,
Plaintiff and Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP P.C., | Chapter 11 |
| Debtor. | Adv. No. |
| RICHARD A. MARSHACK, Trustee of the LPG Liquidation Trust, | COMPLAINT FOR: |
| Plaintiff, | (1) AVOIDANCE, PRESERVATION, AND RECOVERY OF FRAUDULENT TRANSFERS [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07]; |
| v. | |
| CRAIG HUNTER, an individual; VERITAS INVESTIGATIVE SOLUTIONS, LLC, a California limited liability company; STRATEGIC BUSINESS PARTNERSHIPS, LLC, a California limited liability company; LARK HILL INVESTMENTS, LLC, a Wyoming limited liability company; and DOES 1 through 20, inclusive, | (2) AVOIDANCE, PRESERVATION, AND RECOVERY OF FRAUDULENT TRANSFERS [11 U.S.C. §§ 544, 550, 551; CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, AND 3439.07]; |
| | (3) AVOIDANCE, PRESERVATION, AND RECOVERY OF FRAUDULENT TRANSFERS [11 U.S.C. §§ 548(a)(1)(A), 550, 551]; |
| Defendants. | (4) AVOIDANCE, PRESERVATION, AND RECOVERY OF FRAUDULENT TRANSFERS [11 U.S.C. §§ 548(a)(1)(B), 550, 551]; |
| | (5) DISALLOWANCE OF CLAIMS HELD BY DEFENDANT [11 U.S.C. § 502(d)]; |
| | (6) RECISSION OF THE ESA [CAL. CIV. CODE §§ 1566-1570, 1689, AND 1691]; |

1

COMPLAINT

(7) CIVIL EXTORTION [CAL. PENAL CODE §§ 518-519];

(8) CONVERSION;

(9) BREACH OF FIDUCIARY DUTY;

(10) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;

(11) AIDING AND ABETTING FRAUD;

(12) RESTITUTION; AND

(13) RECOVERY OF ATTORNEY'S FEES

[STATUS CONFERENCE TO BE SET BY COURT]

Richard A. Marshack, solely in his capacity as Trustee of the LPG Liquidation Trust, files this complaint against Craig Hunter, Veritas Investigative Solutions, LLC, Strategic Business Partnerships, LLC, Lark Hill Investments, LLC (collectively, "Defendants") and Does 1 through 20, inclusive, (collectively, "Doe Defendants"), and alleges as follows:

## Statement of the Case

1.    After providing nominal consulting services to the Debtor, defendant Craig Hunter ("Mr. Hunter") was hired by Debtor to serve as the chief operating officer. Yet, when Mr. Hunter discovered that the Debtor was operating as a Ponzi scheme, Mr. Hunter breached his fiduciary duties, violated his moral obligations, and used this information to extort over a million dollars from Debtor. To that end, Mr. Hunter used the three entities he controlled, defendants Veritas Investigative Solutions, LLC ("Veritas"), Strategic Business Partnerships, LLC ("SBP"), and Lark Hill Investments, LLC ("Lark Hill"), to receive payments from Debtor under an extorted severance agreement ("ESA"), which Mr. Hunter coerced Debtor to sign under threat of exposing the Debtor's Ponzi scheme.

2.    Mr. Hunter and his entities provided little or no actual value to the Debtor (indeed, Defendants SBP and Lark Hill provided no goods or services), and yet from mid-2021 to 2022, the

///

2

COMPLAINT

4915-5945-1951,v.6

Debtor paid Defendants $1,176,366.45, of which approximately $1.1 million was to buy Mr. Hunter's silence regarding the Ponzi Scheme pursuant to the ESA.

3.      A bankruptcy trustee can avoid a debtor's preferential and fraudulent transfers of property. In this case, the Trustee alleges that Tony Diab ("Mr. Diab") established one or more entities, including Vulcan Consulting Group LLC dba DRD and BAT Inc. dba Coast Processing ("Vulcan/BAT"). Mr. Diab then caused monies paid to and belonging to the Debtor to be deposited in one or more accounts nominally titled in the name of Vulcan/BAT. Such funds were not "transferred," as that term is defined in 11 U.S.C. § 101(54), to Vulcan/BAT. Instead, the beneficial and equitable ownership of the funds always remained Debtor's property. Mr. Diab took these actions to keep Debtor's cash outside the reach of its creditors.

4.      At least $52,360 of such funds belonging to the Debtor were transferred to Defendants purportedly for "consulting services." In addition, at least $1,124,006.45 was transferred directly from the Debtor to Defendants purportedly on account of the ESA. The funds transferred to Defendants from the accounts nominally titled with Vulcan/BAT and from the Debtor itself are collectively referred to as the "Transfers." Trustee alleges that some or all of the Transfers were then subsequently transferred by Defendants to one or more of the Doe Defendants. The Transfers to Defendants occurred during the four-year period prior to the petition date, including certain sums transferred during the 90-day period prior to bankruptcy.

5.      Under these facts, the Trustee can avoid the Transfers and recover from Defendants as the "initial" transferee of such transfers and/or from Doe Defendants as "subsequent" transferees who did not take in good faith, for value, and without knowledge of the avoidability of such transfers.

### Statement of Jurisdiction and Venue

6.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 in that this action arises in and relates to the bankruptcy case pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division, entitled *In re The Litigation Practice Group, P.C.*, Bankruptcy Case Number 8:23-bk-10571-SC.

/ / /

COMPLAINT

4915-5945-1951,v.6

7.      Plaintiff has standing to bring this adversary proceeding pursuant to Provision V.E. of the Modified First Amended Joint Chapter 11 Plan of Liquidation, confirmed by the Court on September 9, 2024, as Dk. No. 1646. The Plan provides that the estate's litigation claims, including avoidance claims, were transferred to the LPG Liquidating Trust. Plaintiff brings these claims on behalf of the Trust.

8.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H), and (O), and this Court has Constitutional authority to enter a final judgment on these claims. To the extent any claim for relief is determined not to be a non-core proceeding or a *Stern*-claim, Plaintiff consents to the entry of final judgment and orders by the Bankruptcy Court.

9.      Venue properly lies in the Central District of California in that this adversary proceeding arises in or is related to a case under Title 11 of the United State Code as provided in 28 U.S.C. §§ 1408 and 1409.

**Parties**

10.      The Litigation Practice Group P.C. ("Debtor") is a corporation organized under the laws of the State of California, that had its principal place of business in Tustin, California. During all relevant times prior to bankruptcy, Daniel S. March ("Mr. March") was the Chief Executive Officer of the Debtor.

11.      On March 20, 2023 ("Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, initiating bankruptcy Case No. 8:23-bk-10571-SC ("Bankruptcy Case") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

12.      Richard A. Marshack (previously defined as "Trustee" or "Plaintiff") was the duly appointed, qualified, and acting Chapter 11 Trustee for the Debtor's bankruptcy estate ("Estate"). Pursuant to the confirmed Plan, the Trustee now serves as Trustee of the LPG Liquidation Trust, which now owns all of the litigation claims, including the Estate's avoidance actions.

13.      Plaintiff alleges that, at all relevant times, Craig Hunter (previously defined as "Mr. Hunter") was an individual residing in Orange County, California.

/ / /

COMPLAINT

4915-5945-1951,v.6

14.    Plaintiff alleges that, at all relevant times, Veritas Investigative Solutions, LLC (previously defined as "Veritas") was a California limited liability company, having an address and/or principal place of business at 18543 Yorba Linda Boulevard, # 192, Yorba Linda, California 92886.  Veritas' current principal business address is 952 Alamo Pintado Road, Solvang, CA 93463-9762.

15.    Plaintiff alleges that, at all relevant times, Mr. Hunter was the managing member and/or chief executive officer of Veritas.

16.    Plaintiff alleges that, at all relevant times, Strategic Business Partnerships LLC (previously defined as "SBP") was a California limited liability company, having a mailing address at 18543 Yorba Linda Boulevard, # 192, Yorba Linda, California 92886, and a principal place of business at 1008 W. Avenue M14, Ste. A – D180, Palmdale, California 93551.  The current principal place of business for SBP is 23 Corporate Plaza Drive, Suite 150-88, Newport Beach, CA 92660.

17.    Plaintiff alleges that, at all relevant times, Mr. Hunter was the managing member of SBP.

18.    Plaintiff alleges that, at all relevant times, Lark Hill Investments LLC (previously defined as "Lark Hill") was a Wyoming limited liability company with a mailing address at 18543 Yorba Linda Boulevard, # 192, Yorba Linda, California 92886 and a principal place of business at1718 Capitol Ave., Cheyenne, WY 82001.

19.    Plaintiff alleges that, at all relevant times, Mr. Hunter was the managing member of Lark Hill.

20.    Plaintiff is ignorant of the true names and capacities of the Doe Defendants and, therefore, sues said defendants under such fictitious names. Plaintiff will amend this Complaint to reflect the true names and capacities of such defendant(s) when they have been ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named individuals and/or entities are responsible in some manner for the occurrences alleged herein and proximately caused Plaintiff's damages by their conduct. Plaintiff is informed and believes, and based thereon alleges, that the fictitiously named defendants may constitute individuals, unknown trusts,

COMPLAINT

4915-5945-1951,v.6

partnerships, related entities, owners, principals, shareholders, insiders, alter egos, co-conspirators, and aiders and abettors that: (a) received transfers from the Debtor and/or Vulcan/BAT as an initial, immediate, or mediate transferee; (b) received transfers from Defendants as a mediate transferee; (c) directed or controlled Defendants' conduct and, as such, were responsible in some manner for the occurrences alleged herein; and/or (c) were used to shield the Debtor's assets from collection, levy or execution, and to otherwise, hinder, delay and defraud the Debtor and its creditors.

21. With Trustee's appointment, he was granted standing to commence and maintain claims and causes of action on behalf of the Debtor's Estate, including but not limited to, claims under sections 541, 542, 544, 547, 548, 549, 550 and 551 of the Bankruptcy Code (collectively, "Recovery Claims").

## General Allegations

### A. The Bankruptcy Case

22. Pre-petition, Debtor was a law firm that provided consumer debt resolution services to more than 50,000 clients nationwide.

23. Mr. Diab operated, dominated, and controlled the Debtor.

24. On May 8, 2023, the Trustee accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. To the extent that the Trustee was not appointed until after any of the events alleged in this Complaint, the allegations are based on information and belief. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, at \*5 (C.D. Cal. Aug. 7, 2014); *Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, at \*4 (C.D. Cal. July 31, 2013).

### B. Fraudulent Entities

25. The consumers that retained Debtor to represent them would pay over a period of time via monthly ACH debits from their bank accounts. These monthly payments were intended to cover all legal services provided by Debtor to those consumers. These funds should have been deposited into an attorney-client IOLTA account until earned. Instead, these funds were never deposited into trust and were diverted to one or more entities created by Tony Diab ("Diab Entities") to receive Debtor's diverted property, other non-debtor entities, insiders, affiliates, marketing

COMPLAINT

4915-5945-1951,v.6

companies, co-conspirators, or otherwise spent on non-business, unnecessary, and lavish personal expenses which ultimately rendered the Debtor insolvent.

26. While the Debtor may have performed legal work for some consumer clients that entitled it to payment, Debtor's Ponzi scheme, commingling of funds, and establishment of various Diab Entities, some with multiple bank accounts, rendered it impracticable for the Trustee to confirm what portion of ACH pulls became earned retainer funds.

27. Mr. Diab has admitted, under penalty of perjury, that he operated the Debtor as a criminal enterprise, specifically, a Ponzi scheme. The Debtor's insolvency led to Mr. Diab and the Debtor improperly selling its stream of retainer payments, sometimes multiple times over, to "investors" in the scheme.

28. After the Debtor's scheme began to crumble, as all Ponzi schemes inevitably must, and the Debtor's creditors began to demand payment from the Debtor, Mr. Diab concocted and enacted a plan to keep Debtor's interests in property outside the reach of creditors. Specifically, Mr. Diab created one or more Diab Entities to receive Debtor's diverted property.

29. These Diab Entities include but are not limited to Vulcan Consulting Group LLC, Coast Processing LLC dba LPG, Oakstone Law Group PC, Greyson Law Center PC, Maverick Management Group, LLC, and Prime Logix, LLC. Several of the Diab Entities purported to operate as debt relief law firms.

30. After the creation of the Diab Entities, many of Debtor's consumer clients were unlawfully "transferred" to one of the Diab Entities to receive legal services, which also led to related ACH receivables being improperly deposited into the accounts of such Diab Entities.

31. As Mr. Diab would obtain loans to or investments in LPG, such funds would also be deposited in the various Diab Entity accounts. Loans owed by, and investments in the Debtor, were often paid from the funds held by the Diab Entities.

32. In sum, Mr. Diab used the bank accounts of the various Diab Entities to hold Debtor money derived from ACH pulls drawn from the accounts of Debtor's consumer clients, lenders who were told and who believed that they were lending to Debtor, and/or investors who were told and who believed that they were investing in Debtor.

7

COMPLAINT

4915-5945-1951,v.6

33.     In the one-year prior to bankruptcy, Debtor's Statements of Financial Affairs confirm that Debtor collected revenues totaling approximately $155 million in ACH payments from its consumer clients.

34.     Under applicable state and federal laws, ACH pulls from a consumer's bank account cannot occur until the party initiating the payments obtains the consumer's express written consent.

35.     With respect to the ACH pulls, the consumer clients only consented to the Debtor initiating the payments from their accounts.

36.     With respect to the ACH pulls, the funds were derived from Debtor's consumer clients who never consented to any entity other than the Debtor representing them and from investors.

### C.     Ponzi Scheme

37.     Mr. Diab's operation of the Debtor as a Ponzi scheme manifested itself in several ways involving the Debtor's stream of ACH receivables from its consumer clients and the funds loaned to and invested in Debtor by third party lenders and investors.

38.     As noted above, Mr. Diab used the Diab Entities he controlled to keep millions of dollars of Debtor's money away from its creditors. The use of the Diab Entities also permitted him to operate, without oversight or detection, and to avoid payment disputes and complications.

39.     Third parties that believed they were loaning money to the Debtor and/or investing in in the Debtor and its streams of receivables were paid from the funds paid by the Debtor's consumer clients so that they would be unaware of the Debtor's insolvency and to perpetuate the Ponzi scheme. Many of these "lenders" actually served as "investors," hoping for very high returns before "the music stopped."

40.     The Debtor also paid certain outside attorneys for services rendered to old clients with the funds obtained from new clients, further perpetuating and facilitating the Ponzi scheme.

41.     The Ponzi scheme also entailed the Debtor incurring debt and obligations that were virtually impossible to repay. Because the Debtor and its marketing affiliates received only incremental payments over time from Debtor's consumer clients, Debtor would sometimes purport to sell the future streams of payments made by its clients to raise additional cash. The same

COMPLAINT
4915-5945-1951,v.6

receivables were often-times bundled and sold multiple times over with no regard for the resulting repayment obligations incurred by the Debtor.

42.    The Debtor would also at times work with marketing affiliates who would convince consumer debtors to sign retainer agreements with the Debtor in exchange for the affiliates' receipt of a portion of the future stream of payments.

43.    The Debtor also obtained money from investors and merchant cash advance lenders at usurious rates and objectively unreasonable terms.

44.    The Debtor knew it did not have the ability to repay its various creditors and, thus, the actions taken by the Debtor constituted a Ponzi scheme orchestrated for improper personal gain.

45.    This Court has recognized that Debtor operated a Ponzi scheme by using funds provided by former investors to attract new investors hoping for very high returns. *See* Dk. No. 1545, fn. 5.

46.    On April 16, 2025, in a separate adversary proceeding by the Trustee against Mr. Diab, the Trustee filed a Motion for Order Approving Stipulation Between Trustee of the LPG Liquidation Trust and Tony Diab ("Trustee's Stipulation with Diab"). *See Marshack v. Diab et al*, Adv. Case No. 8:23-ap-01046-SC, as Adv1046 Dk. No. 761.[1]

47.    The Trustee's Stipulation with Diab includes a Declaration of Tony Diab attesting to certain facts. Adv1046 Dk. No. 761, Exhibit 1, Exhibit A.

48.    On May 29, the Court entered an order approving the Trustee's Stipulation with Diab ("Diab Stipulation Order"). Adv1046 Dk. No. 776.

49.    The Diab Stipulation Order provides that "Diab acknowledges and agrees that the Non-dischargeable Judgment [to be entered against him] is based upon his own fraud, breach of fiduciary duty, and willful and malicious injury to the Debtor including, but not limited to, Diab not requiring the Debtor to maintain client payments in trust, violating numerous federal and state consumer protection laws, and operating the Debtor as a Ponzi scheme." Adv1046 Dk. No. 776, ¶ 3.

/ / /

---

[1] "Adv1046 Dk. No. ___" refers to docket entries in *Marshack v. Diab et al*, Adv. Case No. 8:23-ap-01046-SC.

9

COMPLAINT

4915-5945-1951,v.6

50.     The Ponzi Scheme Presumption establishes a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme." *Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R. 843, 860 (D. Utah 1987). "Knowledge to a substantial certainty constitutes intent in the eyes of the law, cf. Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *Id*. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 (9th Cir. 2024).

51.     "[I]f all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share." *In re Independent Clearing House Co.* 77 B.R. at 859. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Id*. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

52.     Based on the Ponzi Scheme presumption, the Court can presume that the Debtor had the actual intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1). Since the transfers by Debtor to third parties, including Defendants, were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers because they were preferential and/or fraudulent.

### D.     Prepetition Creditors and Lawsuits

53.     Debtor's Schedule E/F, filed on April 4, 2023, as Dk. No. 33, lists: (a) 11 unsecured creditors with priority unsecured claims totaling $374,060.04; and (b) 58 nonpriority unsecured creditors with scheduled claims totaling $141,439,158.05.

54.     The claims register in this Bankruptcy Case includes 2,554 proofs of claim, totaling in excess of $424 million of claims asserted against the Estate.

55.     At least 14 UCC-1 statements were of record securing alleged debts of the Debtor as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then

4915-5945-1951,v.6

owned or thereafter acquired or provided evidence of the assignment or sale of substantial portions of the Debtor's future income. They secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (a) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (b) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (c) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 purportedly secured by a UCC statement filed on or about May 28, 2021; and (d) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.

56.    Debtor's balance sheets for the 36 months ending December 31, 2021, show approximately $17,900,000 in total assets at its highest point in November 2021. This amount is significantly less than the $424 million of claims filed.

57.    Debtor's Statement of Financial Affairs, filed on April 4, 2023, as Dk. No. 34, reflects 15 pending lawsuits against Debtor as of the Petition Date. The lawsuits date back to October 18, 2021 (*Fundura v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 613192-2021) and are as recent as March 10, 2023 (*Diverse Capital LLC v. The Litigation Practice Group P.C. et al.*, Supreme Court of New York Index No. 135614-2023).

### E.    Debtor's Insolvency

58.    Debtor was insolvent when the Transfers occurred as evidenced by: (a) the 14 UCC-1 statements reflecting secured liens against the Debtor's owned and after-acquired assets and the assignment or sale of substantial portions of the Debtor's future income; (b) the priority and non-priority unsecured debt of nearly $142 million listed in Debtor's schedules; (c) the $424 million of creditor claims filed in this Bankruptcy Case; and (d) Debtor's balance sheets reflecting, at its highest point, $17.9 million of assets in November 2021.

59.    Moreover, insolvency is presumed as a matter of law where, as in this Bankruptcy Case, the debtor operated a Ponzi scheme. *See, e.g., Glob. Money Mgmt., L.P. v. McDonnold*, / / /

11

COMPLAINT

2008 U.S. Dist. LEXIS 128733, at *15 (S.D. Cal. Feb. 27, 2008) (concluding that "if a Ponzi scheme is proven, then the debtor is proven insolvent from the time of its inception").

### F. The Subject Transfers

60. During the four-year period prior to the Petition Date, the transfers of interests of the Debtor in property were made to Defendants and/or the Doe Defendants. The full extent of the Transfers will be proven at trial, but are in an amount not less than $1,176.366.45 (previously defined as the "Transfers"). Transfers are set forth in the charts collectively attached as **Exhibit 1**.

61. Plaintiff alleges that most, if not all, of the Transfers made to the Defendants were paid as a result of an extortion scheme perpetrated by Mr. Hunter using Veritas, SBP, Lark Hill, and the Doe Defendants to help conceal the payments made by LPG.

### 1. The Extortion Scheme

62. Plaintiff alleges that, at all relevant times, Coast was owned by Brian Reale, Arash Asante Bayrooti ("Mr. Bayrooti"), and Mr. Diab, with Mr. Bayrooti in charge of operations.

63. Plaintiff alleges that, during 2020, Mr. Bayrooti and Mr. Diab had numerous disagreements regarding the ongoing operations of LPG and Coast.

64. Plaintiff alleges that, in approximately late-2020 or early 2021, Mr. Bayrooti wanted to replace LPG—and particularly Messrs. March and Diab—with another attorney. To that end, Mr. Bayrooti approached Mr. Hunter and asked him to recommend a replacement.

65. Plaintiff alleges that, shortly thereafter, Mr. Hunter asked to meet with Messrs. March and Diab. During the meeting, Mr. Hunter explained to Messrs. March and Diab what Mr. Bayrooti was trying to do and his belief that Mr. Bayrooti was making a mistake.

66. Plaintiff alleges that, over the next few months, Messrs. Bayrooti and Diab continued to fight about the proper course of action for their businesses.

67. Plaintiff alleges that, based in part on Mr. Hunter's help, Mr. Diab prevailed in the dispute with Mr. Bayrooti. As a result, a significant portion of the operations previously performed by Coast were moved to LPG's offices in Tustin, California.

/ / /

/ / /

12

COMPLAINT

4915-5945-1951,v.6

68.     Plaintiff alleges that the transition was overseen by Mr. Hunter, who was paid a flat $25,000 consulting fee in exchange for his assistance. At Mr. Hunter's direction, that consulting fee was paid to Veritas.

69.     Plaintiff alleges that LPG hired Mr. Hunter to work as its chief operating officer or in a position with a title and job responsibilities that were the functional equivalent to a chief operating officer. Mr. Hunter assumed that role in approximately June 2021.[2]

70.     Plaintiff alleges that, in his role as chief operating officer, Mr. Hunter learned (a) of the Debtor's methods of operation, including that the Debtor was operating as a Ponzi scheme or the functional equivalent thereof; (b) that the Debtor's aggregate liabilities exceed its assets; and (c) of other decisions of management, facts, and circumstances establishing that the Debtor's ongoing operations were wrongful.

71.     Plaintiff alleges that Mr. Hunter decided to use the information he obtained regarding how the Debtor was operating to his economic advantage.

72.     Plaintiff alleges that Mr. Hunter formed, or caused to be formed, SBP and Lark Hill so that he could use those two entities in his quest to take economic advantage of the Debtor's wrongful actions.

73.     Plaintiff alleges that, in furtherance of his scheme to take economic advantage of the Debtor's wrongful acts, and less than one month after he started working at LPG, Mr. Hunter began causing problems. In approximately July 2021, Mr. Hunter was pushing Mr. March to terminate Mr. Diab's employment.

74.     Plaintiff alleges that, because Mr. Hunter's attempts to terminate Mr. Diab proved disruptive to LPG's operations, Messrs. March and Diab regularly discussed Mr. Hunter's actions. In doing so, Messrs. March and Diab were ignorant of Mr. Hunter's scheme to take advantage of the Debtor's wrongful acts.

---

[2] Pursuant to the Statement of Work attached to the Services Agreement, dated June 1, 2021 (the "Services Agreement"), Veritas' billing rate to the Debtor would be $25,000 per month.  This agreement provided that even if the agreement were terminated early, the Debtor would still be liable to pay the agreed salary until the completion of one year (through May 31, 2022); in other words, Mr. Hunter and Veritas would be owed a maximum aggregate amount of $300,000.

13

COMPLAINT

4915-5945-1951,v.6

75. Plaintiff alleges that Mr. Hunter's continuous efforts to cause a rift between Messrs. Diab and March were a calculated part of Mr. Hunter's scheme to take advantage of the Debtor as he sought a pretext to leverage the information that he had obtained for his own benefit.

76. Plaintiff alleges that, in August 2021, Messrs. Diab and March reached the decision that Mr. Hunter had to be terminated, which served as the pretext Mr. Hunter's needed to effectuate his extortion scheme.

77. Plaintiff alleges that, approximately one day after he was terminated, Mr. Hunter returned to LPG's office, spoke with Mr. March, threatening to make complaints to the California State Bar, the Orange County District Attorney's Office, the Federal Trade Commission, the Consumer Financial Protection Bureau, and other law enforcement agencies against Messrs. March and Diab, unless LPG agreed to pay him an exorbitant amount of money.

78. Plaintiff alleges that, under duress, Mr. March agreed.

79. Plaintiff alleges that LPG's promise to pay money was embodied in the ESA that ultimately paid Mr. Hunter more than $1.1 million. A true and correct copy of the ESA is attached as **Exhibit 2**.[3]

80. Although as of the date of the ESA, (a) Hunter and Veritas had only been providing services to the Debtor for approximately two months, and (b) the ESA purported to be a "separation agreement," the "Separation Pay" to Veritas and Mr. Hunter consisted of $1.12 million, nearly four times the annual value of the Services Agreement.  The ESA contained no details or explanation as to why such a large amount was due as Separation Pay.

81. Plaintiff alleges that Mr. Hunter received payments from LPG in four different ways. He received a single payment directly from LPG and used three entities that he owns or controls to receive the remainder of the payments, including all of the payments made under the ESA, all as part of his scheme to extort money from the Debtor.

82. Plaintiff alleges that Mr. Hunter received a single $25,000 payment in July 2021 based on the Services Agreement.

---

[3] The ESA is titled the "Separation Agreement and Release, dated August 31, 2021."

COMPLAINT

4915-5945-1951,v.6

83.    Plaintiff alleges that Mr. Hunter received payments through Veritas. Beginning in approximately December 2020 and continuing through approximately April 2021, Veritas was hired by LPG to perform background checks on employees that LPG hired. Over the course of roughly five months, Veritas performed approximately 17 background checks at a cost of around $140 each. LPG paid for these services

84.    Plaintiff alleges that in or around late June 2021, LPG paid Veritas $25,000 for Mr. Hunter's "consulting" efforts in overseeing the transition of work and employees from Coast to LPG.

85.    Plaintiff alleges that, on or about August 13, 2021, Veritas received the first payment under the ESA of $200,000. Veritas continued receiving payments under the ESA until approximately November 2022. Veritas did not perform any services for, or provide any assistance to, LPG after April 2021. Nonetheless, from approximately June 2021 through approximately November 2022, at Mr. Hunter's insistence, LPG paid Veritas $689,910, including $25,000 for "consulting" services and $664,910 under the ESA.

86.    Plaintiff alleges that Mr. Hunter received payments through SBP.

87.    Plaintiff alleges that SBP did not provide any goods or services to LPG at any point in time. Nonetheless, from approximately July 2021 through approximately June 2022, at Mr. Hunter's insistence, LPG paid SBP $349,096.45, including at least $330,000 under the ESA.

88.    Plaintiff alleges that Mr. Hunter received payments through Lark Hill.

89.    Plaintiff alleges that Lark Hill did not provide any goods or services to LPG at any point in time. Nonetheless, from approximately May 2022 through approximately June 2022, at Mr. Hunter's insistence, LPG paid Lark Hill $210,000 under the ESA.

90.    Plaintiff alleges that, in total, approximately $1,124,006.45 was paid to Defendants because of Mr. Hunter's extortion and on account of the ESA.  These payments were not for consulting or COO services because Mr. Hunter and Veritas only provided services for approximately two months, at an agreed upon rate of $25,000 per month, and, as confirmed by

///

///

15
COMPLAINT

4915-5945-1951,v.6

Mr. Diab, the Debtor agreed to pay Mr. Hunter out of fear that Mr. Hunter would follow through on his threats.

91.     Plaintiff alleges that, before each payment was made under the ESA, Mr. Hunter contacted Mr. March and demanded money.

92.     Plaintiff alleges that each time Mr. Hunter demanded money, he threatened to make complaints to the California State Bar, the Orange County District Attorney's Office, the Federal Trade Commission, the Consumer Financial Protection Bureau, and other law enforcement agencies against LPG, Mr. March, and Mr. Diab unless more money was paid immediately.

93.     Plaintiff alleges that, after receiving Mr. Hunter's threats, Mr. March feared for what would happen and went to Mr. Diab, demanding that more money be sent to one of Mr. Hunter's companies, and specifically, to the company that Mr. Hunter demanded receive the funds.

94.     Plaintiff alleges that each time Mr. Hunter demanded more money, Mr. March talked with Mr. Diab about the threats made by Mr. Hunter. Each time, Mr. March was agitated and scared, and expressed concerns about his safety. In turn, Mr. March's agitation and concern caused Mr. Diab to fear what would happen if payments under the ESA were stopped.

95.     Plaintiff alleges that Mr. Hunter's background and previous actions are among the reasons that caused Messrs. March and Diab concern. For example, Mr. Hunter was the former chief investigator for the Orange County District Attorney's Office and bragged about his continued connections at the highest levels of local law enforcement and his ability to direct investigations through his contacts.

96.     Plaintiff alleges that Mr. Hunter also bragged about how he previously extorted money from Harry Sidhu, the disgraced former mayor of Anaheim who pled guilty to corruption charges.

97.     Plaintiff alleges that Mr. Hunter's past actions made Messrs. March and Diab believe that Mr. Hunter would carry out the threats he made against them if payments under the ESA ceased.

### 2.     The Guaranty Lawsuit

98.     Plaintiff alleges that, in approximately September or October 2024, Mr. Hunter filed a lawsuit against Messrs. March and Diab ("Guaranty Lawsuit"). There, Mr. Hunter alleges that

16

COMPLAINT

4915-5945-1951,v.6

Messrs. March and Diab personally guaranteed that payments would be made under the ESA. Mr. Hunter claims that Messrs. March and Diab still owe him approximately $400,000.

99.     Plaintiff alleges that Mr. March was served with a copy of the complaint in the Guaranty Lawsuit and filed an answer.

100.    Plaintiff alleges that, after learning of the Trustee's claims against him, Mr. Hunter contacted Mr. March, claiming that he would dismiss the Guaranty Lawsuit if Mr. March agreed to help him fight the Trustee's claims. In particular, Mr. Hunter wanted help justifying the payments made under the ESA.

101.    Plaintiff alleges that Mr. Hunter repeatedly contacted Mr. Diab, wanting help justifying the payments made to him under the ESA in exchange for dismissal of the Guaranty Lawsuit.

102.    Plaintiff alleges that Mr. Hunter's attempts to influence Messrs. March and Diab constitute an attempt to buy or otherwise influence testimony in connection with this action.

### 3.     Avoidability of the Transfers

103.    To the extent the Court determines that some or all of the Transfers made during the four-year period prior to the Petition Date were made: (a) with actual intent to hinder, delay, or defraud Debtor's creditors; and/or (b) without Debtor receiving reasonably equivalent value in exchange, the Trustee alleges that such Transfers are avoidable under 11 U.S.C. § 544 and 548 and under Cal. Civ. Code §§ 3439.04 and 3439.05 (collectively, the "Fraudulent Transfers").

104.    Plaintiff alleges that Debtor was insolvent when the Transfers were made or became insolvent as a result of the Transfers.

105.    Plaintiff alleges that Debtor did not receive reasonably equivalent value in exchange for or in connection with the Transfers.

106.    Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover the Transfers or their value from Defendants and Doe Defendants as initial or subsequent transferees.

107.    Under 11 U.S.C. § 551, avoided transfers are automatically preserved for the benefit of the Estate.

/ / /

COMPLAINT

4915-5945-1951,v.6

## G.   Due Diligence

108.   On September 27, 2024, Plaintiff caused a letter to be mailed to Defendant Veritas ("Letter to Veritas") requesting documents and information to substantiate the Transfers, to assess the purpose of the Transfers, and to evaluate any potential defenses to Plaintiff's avoidance and recovery of the Transfers. On December 2, 2024, Plaintiff received a response to the Letter to Veritas, as well as a supplemental response on January 8, 2025.

109.   On September 27, 2024, Plaintiff caused a letter to be mailed to Defendant SBP ("Letter to SBP") requesting documents and information to substantiate the Transfers, to assess the purpose of the Transfers, and to evaluate any potential defenses to Plaintiff's avoidance and recovery of the Transfers. On November 14, 2024, Plaintiff received a response to the Letter to SBP.

110.   Between September 2024 and March 2025, the parties exchanged numerous documents and information.

111.   On or around March 13, 2025, Plaintiff and Defendants executed an agreement to toll and suspend any and all applicable statutes of limitations and statutes of periods of repose and laches for a period through and including September 22, 2026 ("Tolling Period"), unless otherwise agreed to in writing by Plaintiff and Defendants, for any and all Recovery Claims or other claims which Debtor, the Estate, the Trust, or Trustee may have against Defendants and any applicable third parties.

112.   During the Tolling Period, Plaintiff's counsel contacted Defendants, requesting documents and information to substantiate the Transfers ("Follow-Up Communication"). Plaintiff received documents and information that, upon Plaintiff's review, did not substantiate the Transfers and did not demonstrate facts supporting any applicable defense to Defendants' receipt of Transfers.

113.   Prior to filing this Complaint, Plaintiff's counsel conducted an electronic search of the Debtor's paper files and accounting records, including Debtor's QuickBooks files, which records and files are now stored electronically. Plaintiff's search of the subject records and files revealed no apparent defenses to the alleged claims.

/ / /

/ / /

COMPLAINT

4915-5945-1951,v.6

## First Claim for Relief

## Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer

## 11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07

## (Against all Defendants)

114.    Plaintiff incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full.

115.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of the Debtor which are voidable under applicable law by an unsecured creditor of the Debtor, including under California Civil Code § 3439.04(a)(1).

116.    The Fraudulent Transfers were of property of the Debtor.

117.    The Fraudulent Transfers were made within four years of the Petition Date.

118.    The Fraudulent Transfers were made with the actual intent to hinder, delay, or defraud Debtor's creditors.

119.    At the time each Fraudulent Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Fraudulent Transfer and on the Petition Date.

120.    Debtor had been sued or threatened with suit before some or all of the Fraudulent Transfers occurred.

121.    Debtor incurred substantial debt shortly before or shortly after some or all of the Fraudulent Transfers occurred.

122.    Mr. Diab caused Debtor to abscond and delay the discovery of substantial assets of the Debtor pursuant to the diversion of the Debtor's funds, client files, and assets to multiple Diab Entities.

123.    Based on the Ponzi Scheme presumption, the Court can presume that Debtor had the actual intent to defraud investors within the meaning of 11 U.S.C. § 544(b) and Cal. Civ. Code § 3439.04(a)(1). Because the transfers by Debtor to third parties, including Defendants, were made with the intent to further the Ponzi scheme, Debtor did not receive reasonably equivalent value for such transfers, and the transfers can be avoided because they were preferential and/or fraudulent.

COMPLAINT

4915-5945-1951,v.6

124.    Debtor actively concealed its beneficial interest in the Fraudulent Transfers and made the payments to Defendants, under the ESA, as an attempt to prevent Mr. Hunter from disclosing the Ponzi scheme, with actual intent to hinder, delay, or defraud other creditors of the Debtor.

125.    Vulcan/BAT, who benefitted from the receipt of funds improperly diverted away from the Debtor, would be considered insiders under Cal. Civ. Code § 3439.04(b)(1).

126.    Debtor received less than reasonably equivalent value in exchange for the Transfers. Defendants and/or Doe Defendants received at least $1,176.366.45 of property belonging to the Debtor because the extorted promise to pay memorialized in the ESA (a) was made in hope of preventing Mr. Hunter from disclosing the Debtor's Ponzi scheme and (b) greatly exceeded the value of any work due under the Services Agreement.

127.    The Fraudulent Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers. Claims filed in this case exceed $424 million, whereas the Debtor's assets were $17.9 million at the highest point (in November 2021). Under the balance sheet test, the Debtor was or became insolvent as a result of the Fraudulent Transfers.

128.    The Fraudulent Transfers were made partially for the benefit of an insider of the Debtor. The detriment of the Fraudulent Transfers accrued to the Debtor, and the Debtor received no direct or indirect benefit.

129.    Plaintiff alleges that Defendants and/or Doe Defendants did not receive the Fraudulent Transfers in good faith, for value, and without knowledge of their avoidability.

130.    Based on the foregoing, Plaintiff may avoid the Fraudulent Transfers pursuant to 11 U.S.C. § 544 and California Civil Code § 3439.04(a)(1).

131.    Based on the foregoing, Plaintiff may recover and preserve the Fraudulent Transfers from Defendants and/or Doe Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

132.    The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual

COMPLAINT

4915-5945-1951,v.6

damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

**Second Claim for Relief**

**Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer**

**11 U.S.C. §§ 544, 550, 551; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

**(Against all Defendants)**

133.    Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

134.    Under 11 U.S.C. § 544(b)(1), Plaintiff may avoid transfers of an interest of the Debtor which are voidable under applicable law by an unsecured creditor of the Debtor, including under California Civil Code §§ 3439.04(a)(2) and 3439.05.

135.    Debtor did not receive reasonably equivalent value in exchange for the funds diverted to Vulcan/BAT.

136.    Debtor did not receive reasonably equivalent value in exchange for the Fraudulent Transfers because the extorted promise to pay memorialized in the ESA (a) was made in hope of preventing Mr. Hunter from disclosing the Debtor's Ponzi scheme and (b) greatly exceeded the value of any work due under the Services Agreement.

137.    The Fraudulent Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.

138.    At the time each Fraudulent Transfer was made, Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

139.    At the time each Fraudulent Transfer was made, Debtor intended to incur, or believed or reasonably should have believed that Debtor would incur, debts beyond Debtor's ability to pay as they became due.

140.    At the time each Fraudulent Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Fraudulent Transfer and on the Petition Date.

21

COMPLAINT

4915-5945-1951,v.6

141. Vulcan/BAT, who benefitted from the receipt of funds improperly diverted away from the Debtor, would be considered insiders under Cal. Civ. Code § 3439.04(b)(1).

142. The Fraudulent Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers. Claims filed in this case exceed $424 million, whereas the Debtor's assets were $17.9 million at the highest point (in November 2021). Under the balance sheet test, the Debtor was or became insolvent as a result of the Fraudulent Transfers.

143. Plaintiff alleges that Defendants and/or Doe Defendants did not receive the Fraudulent Transfers in good faith, for value, and without knowledge of their avoidability.

144. Based on the foregoing, Plaintiff may avoid the Fraudulent Transfers pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05.

145. Based on the foregoing, Plaintiff may recover and preserve the Fraudulent Transfers from Defendants and/or Doe Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551, and Cal. Civ. Code § 3439.07.

146. The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

**Third Claim for Relief**

**Avoidance, Preservation, and Recovery of Actual Fraudulent Transfer**

**11 U.S.C. §§ 548(a)(1)(A), 550 & 551**

**(Against all Defendants)**

147. Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

148. One or more of the Fraudulent Transfers were made within two years of the Petition Date.

///

22

COMPLAINT

4915-5945-1951,v.6

149.    The Fraudulent Transfers were made to Defendants with the actual intent to hinder, delay, or defraud Debtor's creditors.

150.    Based on the Ponzi Scheme presumption, the Court can presume that the Debtor had the actual intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1)(A). Because the transfers by Debtor to third parties, including Defendants, were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for such transfers, and the Trustee can avoid any such transfers because they were preferential and/or fraudulent.

151.    At the time each Fraudulent Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Fraudulent Transfer and on the Petition Date.

152.    Debtor had been sued or threatened with suit before some or all of the Fraudulent Transfers occurred.

153.    Debtor incurred substantial debt shortly before or shortly after some or all of the Fraudulent Transfers occurred.

154.    Mr. Diab caused Debtor to abscond and delay the discovery of substantial assets of the Debtor pursuant to the diversion of the Debtor's funds, client files, and assets to multiple Diab Entities.

155.    Mr. Diab actively concealed Debtor's assets pursuant to the diversion of funds, client files, and assets to Diab Entities.

156.    Vulcan/BAT, who benefitted from the receipt of funds improperly diverted away from the Debtor, would be considered insiders as that term is defined in 11 U.S.C. § 101(31).

157.    Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfers totaling $1,176.366.45.  Defendants and/or Doe Defendants received at least $1,176.366.45 of property belonging to the Debtor because the extorted promise to pay memorialized in the ESA (a) was made in hope of preventing Mr. Hunter from disclosing the Debtor's Ponzi scheme and (b) greatly exceeded the value of any work due under the Services Agreement.

COMPLAINT

4915-5945-1951,v.6

158.    The Fraudulent Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.  Claims filed in this case exceed $424 million, whereas the Debtor's assets were $17.9 million at the highest point (in November 2021).  Under the balance sheet test, the Debtor was or became insolvent as a result of the Fraudulent Transfers.

159.    Plaintiff alleges that Defendants and/or Doe Defendants did not receive the Fraudulent Transfers in good faith, for value, and without knowledge of their avoidability.

160.    Based on the foregoing, Plaintiff may avoid the Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A).

161.    Based on the foregoing, Plaintiff may recover and preserve the avoided transfers up to the amount of the Fraudulent Transfers from Defendants and/or Doe Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate under 11 U.S.C. §§ 550 and 551.

## Fourth Claim for Relief

## Avoidance, Preservation, and Recovery of Constructive Fraudulent Transfer

## 11 U.S.C. §§ 548(a)(1)(B), 550 & 551

## (Against all Defendants)

162.    Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

163.    One or more of the Fraudulent Transfers were made within two years before the Petition Date.

164.    Debtor did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

165.    The Fraudulent Transfers were made at a time when Debtor was insolvent and/or rendered insolvent by virtue of said transfers.  Claims filed in this case exceed $424 million, whereas the Debtor's assets were $17.9 million at the highest point (in November 2021).  Under the balance sheet test, the Debtor was or became insolvent as a result of the Fraudulent Transfers.

166.    When the Fraudulent Transfers occurred, Debtor's business was undercapitalized and Debtor was engaged in business for which its capital was unreasonably small.

24

COMPLAINT

4915-5945-1951,v.6

167. When the Fraudulent Transfers occurred, Debtor was about to incur debts that were beyond its ability to pay.

168. The Fraudulent Transfers were made for the benefit of Defendants and Vulcan/BAT, which were insiders of the Debtor.

169. At the time each Fraudulent Transfer was made, Debtor was indebted to one or more creditors that held a claim against Debtor on the date of each Fraudulent Transfer and on the Petition Date.

170. Plaintiff alleges that Defendants and/or Doe Defendants did not receive the Fraudulent Transfers in good faith, for value, and without knowledge of their avoidability.

171. Based on the foregoing, Plaintiff may avoid the Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B).

172. Based on the foregoing, Plaintiff may recover and preserve the avoided Fraudulent Transfers from Defendants and/or Doe Defendants as the initial transferee or, alternatively, as the subsequent transferee for the benefit of the Estate under 11 U.S.C. §§ 550 and 551.

## Fifth Claim for Relief

## Disallowance of Claim

## 11 U.S.C. § 502(d)

## (Against all Defendants)

173. Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

174. Plaintiff alleges that Defendants and/or Doe Defendants may have a claim against the Estate.

175. Pursuant to 11 U.S.C. § 502(d), Plaintiff requests that any claim asserted by Defendants and/or Doe Defendants be disallowed unless or until the avoidable Transfers are repaid by Defendants and/or Doe Defendants.

/ / /

/ / /

/ / /

COMPLAINT

4915-5945-1951,v.6

# Sixth Claim for Relief

## Recission of the ESA

## California Civil Code §§ 1566-1570, 1689, and 1691

## (Against all Defendants)

176. Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

177. Plaintiff is entitled to rescind the ESA as each and every payment was made as a result of duress or menace. *See, e.g. Tran v. Nguyen*, 97 Cal.App.5th 523 (2023).

178. The Debtor received nothing of value under the ESA.

179. As a result of the threats, duress, and menace imposed upon the Debtor by Defendants, the Debtor caused not less than $1,176.366.45 to be transferred to Defendants, nominally labeled as payments under the ESA.

180. Plaintiff is entitled to recover all of the payments that it made under the ESA as part of the rescission.

181. The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

# Seventh Claim for Relief

## Civil Extortion

## California Penal Code §§ 518-519

## (Against all Defendants)

182. Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

183. Within two years of the Petition Date, Defendants obtained the Transfers based on threats made by Mr. Hunter to Messrs. March and Diab.

///

COMPLAINT

4915-5945-1951,v.6

184.    As a result of the threats, duress, and menace imposed upon the Debtor by Defendants, the Debtor caused not less than $1,176,366.45 in Transfers to be paid to Defendants, nominally labeled as payments under the ESA.

185.    All payments made by the Debtor to the Defendants based on the ESA were made out of fear and because of the threats made by Mr. Hunter. To obtain payments under the ESA, the Defendants used and relied on threats, extortion, and bad faith actions such that Defendants acted with oppression, fraud, or malice to obtain such payments. Plaintiff is entitled to recover all payments made to Defendants under the ESA and to recover punitive damages according to proof at trial.

186.    The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

## Eighth Claim for Relief

### Conversion

### (Against all Defendants)

187.    Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

188.    Within two years of the Petition Date, Defendants obtained funds by way of the Transfers that rightly belonged to the Debtor.

189.    Defendants would not have obtained funds by way of the Transfers absent Defendants' wrongful acts, including, but not limited to, extorting funds from the Debtor.

190.    Defendants exercised wrongful control over the Debtors' property, including by not limited to the Transfers.

191.    The funds the Debtors obtained by way of the Transfers never ceased belonging to the Debtor.

///

27

COMPLAINT

4915-5945-1951,v.6

192.    The Defendants obtained not less than $1,124,006.45 by way of their conversion, thereby damaging the Debtor. The Debtor is entitled to recover all such funds from the Defendants.

193.    In converting the Debtor's funds, the Defendants used and relied on threats, extortion, and bad faith actions such that Defendants acted with oppression, fraud, or malice to obtain such funds. The Debtor is entitled to recover all funds converted by the Defendants and punitive damages according to proof of trial.

194.    The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

**Ninth Claim for Relief**

**Breach of Fiduciary Duty**

**(Against Hunter)**

195.    Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and realleges these paragraphs as though set forth in full herein.

196.    As the Debtor's chief operating officer, or the functional equivalent thereof, Hunter knew and understood that he was an officer of the Debtor, and that he owed a fiduciary duty to the Debtor.

197.    In his capacity as chief operating officer, Hunter learned that Debtor was operating wrongfully. In particular, Hunter learned that Debtor was operating as Ponzi scheme or otherwise perpetrating a fraud on its clients and customers through the methods of its operations.

198.    Hunter had a duty to report the Debtor's wrongful conduct, take actions that would stop the Ponzi scheme, take actions that would end the harm caused by Debtor's operations, or otherwise act in accordance with his fiduciary duty to the Debtor.

/ / /

/ / /

/ / /

28

COMPLAINT

4915-5945-1951,v.6

199.	While acting as Debtor's chief operating officer, Hunter set in motion a scheme designed to allow him to use the knowledge that he obtained regarding Debtor's wrongful conduct to his personal benefit. Indeed, instead of acting in accordance with his fiduciary obligations, Hunter extorted at least $1,124,006.45 in payments from the Debtor, directly or indirectly, in exchange for his silence. All such payments were made to companies owned or controlled by Hunter.

200.	Hunter's actions constitute a breach of the fiduciary duties that he owed to the Debtor, damaging the Debtor in an amount that is not less than $1,124,006.45.

201.	In establishing and perpetrating his scheme, Hunter used and relied on threats, extortion, and bad faith, such that Hunter acted with oppression, fraud, or malice to obtain payments from the Debtor, directly or indirectly.

202.	The Debtor is entitled to recover all funds paid to Hunter, directly or indirectly, as a result of his extortion, and is entitled to recover punitive damages according to proof of trial.

203.	The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

## Tenth Claim for Relief

## Aiding and Abetting Breach of Fiduciary Duty

## (Against Veritas, SBP, and Lark Hill)

204.	Plaintiff hereby incorporates by reference Paragraphs 1 through 113 and 195 through 203 and realleges these paragraphs as though set forth in full herein.

205.	At all times relevant to this complaint, Veritas, SBP, and Lark Hill was owned, directly or indirectly, by Hunter.

206.	At all times relevant to this complaint, Hunter served as the managing member, chief executive officer, or principal decision-maker for Veritas, SBP, and Lark Hill.

207.	At all times relevant to this complaint, Veritas, SBP, and Lark Hill knew that Hunter was or had been the Debtor's chief operating officer, or the functional equivalent thereof.

29

COMPLAINT

4915-5945-1951,v.6

208. At all times relevant to this complaint, Veritas, SBP, and Lark Hill knew that Hunter owed, or had owed, fiduciary duties to the Debtor.

209. At all times relevant to this complaint, Veritas, SBP, and Lark Hill knew that Hunter had discovered that the Debtor was operating as a Ponzi scheme or was otherwise perpetrating a fraud on its clients and customers through the methods of its operations.

210. At all times relevant to this complaint, Veritas, SBP, and Lark Hill knew of Hunter's scheme that was designed to allow Hunter to use his knowledge of the Debtor's Ponzi scheme and other wrongful conduct for his personal benefit.

211. At all times relevant to this complaint, Veritas, SBP, and Lark Hill knew and understood that, instead of acting in accordance with his fiduciary obligations, Hunter intended to and was extorting in payments from the Debtor in exchange for not revealing the Debtor's wrongful conduct.

212. Veritas, SBP, and Lark Hill provided substantial assistance to Hunter in perpetrating his scheme to extort funds from the Debtor in return for not revealing the wrongful nature of the Debtor's actions.

213. Specifically, at Hunter's insistence and direction, Veritas, SBP, and Lark Hill received all of the payments that were made by the Debtor, directly or indirectly, to Hunter in order to keep and maintain Hunter's silence regarding the Debtor's wrongful conduct.

214. As a result of the assistance that they provided to Hunter, Veritas, SBP, and Lark Hill received not less than $1,124,006.45 from the Debtor, directly or indirectly, and provided no services or benefit to the Debtor in exchange for the same.

215. In aiding Hunter to establish and perpetrate his scheme, Veritas, SBP, and Lark Hill substantially participated in Hunter's use of threats, extortion, and bad faith, such that Veritas, SBP, and Lark Hill acted with oppression, fraud, or malice to obtain payments from the Debtor, directly or indirectly.

216. The Debtor is entitled to recover all funds paid to Veritas, SBP, and Lark Hill, directly or indirectly, as a result of Hunter's extortion scheme, and is entitled to recover punitive damages according to proof of trial.

COMPLAINT
4915-5945-1951,v.6

217.    The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

**Eleventh Claim for Relief**

**Aiding and Abetting Fraud**

**(Against all Defendants)**

218.    Plaintiff hereby incorporates by reference Paragraphs 1 through 113, 195 through 203, and 204 through 217 and realleges these paragraphs as though set forth in full herein.

219.    At all times relevant, the Defendants, and each of them, knew that Debtor was operating as Ponzi scheme or was otherwise perpetrating a fraud on its clients and customers through the methods of its operations.

220.    The Defendants, and each of them, provided substantial help and aid to the Debtor as it perpetrated its Ponzi scheme or fraud on its clients and customers through its operations by, among other things, not reporting the Debtor's wrongful conduct and allowing the same to continue for nearly 18 months.

221.    The Defendants, and each of them, benefitted substantially from allowing the Debtor's Ponzi scheme or fraud on its clients and customers to continue. Indeed, the Defendants received not less than $1,124,006.45in exchange for allowing the Debtor's scheme to continue.

222.    In aiding Debtor to continue its Ponzi scheme or was otherwise perpetrate a fraud on its clients and customers through the methods of its operations, the Defendants acted with oppression, fraud, or malice to obtain payments from the Debtor, directly or indirectly.

223.    The Debtor or its estate was substantially harmed by the Defendants acts and omissions that allowed the Ponzi scheme or fraud on Debtor's clients and customers to continue in an amount to be proven at trial but not less than $1,124,006.45. The Debtor or its estate is also entitled to recover punitive damages according to proof at trial.

/ / /

31

COMPLAINT

4915-5945-1951,v.6

224.    The acts of the Defendants were undertaken for improper purposes and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors. They were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages pursuant to Cal. Civil Code § 3294.

## Twelfth Claim for Relief

### Restitution

### (Against all Defendants)

225.    Plaintiff hereby incorporates by reference Paragraphs 1 through 113, 195 through 203, 204 through 214, and 218 through 224, and realleges these paragraphs as though set forth in full herein.

226.    Defendants wrongfully benefitted to the detriment of the Debtor by wrongfully taking, misappropriating, or converting $1,124,006.45 from the Debtor.

227.    The Debtor has not been reimbursed in any manner for the funds that were taken, misappropriated, or converted from the Debtor.

228.    Accordingly, it would be unjust for the Defendants to retain said benefits at the Debtor's expense.

229.    The Debtor demands that the Defendants make restitution in the amount to be proven at trial, but not less than $1,124,006.45, plus interest, from the date of their wrongful taking.

## Thirteenth Claim for Relief

### Recovery of Attorney's Fees

### Federal Rule of Bankruptcy Procedure 7054(b)

### (Against all Defendants)

230.    Plaintiff hereby incorporates by reference Paragraphs 1 through 113, and realleges these paragraphs as though set forth in full herein.

231.    Pursuant to Rule 7054(b) of the Federal Rules of Bankruptcy Procedure, the Plaintiff separately states his request for attorney's fees, costs, and any other sanction the Court deems proper.

COMPLAINT

4915-5945-1951,v.6

232. The Plaintiff is also entitled to judgment for all attorney's fees and costs incurred in this matter pursuant to the Court's inherent powers and other applicable federal and state law.

## Prayer

WHEREFORE, Plaintiff prays for judgment against Defendants and Doe Defendants as follows:

## On the First Claim for Relief

1. That the Fraudulent Transfers be avoided under 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07;

2. That Plaintiff recover the avoided Fraudulent Transfers or a money judgment in an amount equal to the value of the avoided Fraudulent Transfers pursuant to 11 U.S.C. § 550;

3. That Plaintiff only recover a single satisfaction of all avoided Transfers under 11 U.S.C. § 550(d);

4. That all avoided Transfers be preserved pursuant to 11 U.S.C. § 551;

## On the Second Claim for Relief

5. That the Fraudulent Transfers be avoided under 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07;

6. That Plaintiff recover the avoided Fraudulent Transfers or a money judgment in an amount equal to the value of the avoided Fraudulent Transfers pursuant to 11 U.S.C. § 550;

7. That Plaintiff only recover a single satisfaction of all avoided Transfers under 11 U.S.C. § 550(d);

8. That all avoided Transfers be preserved pursuant to 11 U.S.C. § 551;

## On the Third Claim for Relief

9. That the Fraudulent Transfers be avoided under 11 U.S.C. § 548(a)(1)(A);

10. That Plaintiff recover the avoided Fraudulent Transfers or a money judgment in an amount equal to the value of the avoided Fraudulent Transfers pursuant to 11 U.S.C. § 550;

/ / /

/ / /

/ / /

33

COMPLAINT

4915-5945-1951,v.6

11.    That Plaintiff only recover a single satisfaction of all avoided Transfers under 11 U.S.C. § 550(d);

12.    That all avoided Transfers be preserved pursuant to 11 U.S.C. § 551;

**On the Fourth Claim for Relief**

13.    That the Fraudulent Transfers be avoided under 11 U.S.C. § 548(a)(1)(B);

14.    That Plaintiff recover the avoided Fraudulent Transfers or a money judgment in an amount equal to the value of the avoided Fraudulent Transfers pursuant to 11 U.S.C. § 550;

15.    That Plaintiff only recover a single satisfaction of all avoided Transfers under 11 U.S.C. § 550(d);

16.    That all avoided Transfers be preserved pursuant to 11 U.S.C. § 551;

**On the Fifth Claim for Relief**

17.    That any claim of Defendants and/or Doe Defendants against the Estate be disallowed in its entirety unless or until Defendants and/or Doe Defendants timely repay the avoidable Transfers;

**On the Sixth Claim for Relief**

18.    That the ESA be rescinded;

19.    That Plaintiff recover all funds paid to the Defendants under the ESA;

**On the Seventh Claim for Relief**

20.    That Plaintiff recover all funds paid to the Defendants under the ESA in an amount to be proven at trial but not less than $1,124,006.45;

21.    That Plaintiff recover punitive damages according to proof at trial;

**On the Eighth Claim for Relief**

22.    That Plaintiff recover all funds converted by the Defendants in an amount to be proven at trial but not less than $1,124,006.45;

23.    That Plaintiff recover punitive damages according to proof at trial;

/ / /

/ / /

/ / /

34

COMPLAINT

4915-5945-1951,v.6

## On the Ninth Claim for Relief

24.     That Plaintiff recover all funds paid to Hunter, directly or indirectly, in an amount to be proven at trial but not less than $1,124,006.45;

25.     That Plaintiff recover punitive damages according to proof at trial;

## On the Tenth Claim for Relief

26.     That Plaintiff recover all funds paid to Veritas, SBP, and Lark Hill in an amount to be proven at trial but not less than $1,124,006.45;

27.     That Plaintiff recover punitive damages according to proof at trial;

## On the Eleventh Claim for Relief

28.     That Plaintiff recover all funds paid to the Defendants in an amount to be proven at trial but not less than $1,124,006.45;

29.     That Plaintiff recover punitive damages according to proof at trial;

## On the Twelfth Claim for Relief

30.     Compensatory damages the Estate and creditors have sustained by reason of the actions of the Defendants and according to proof at trial but not less than $1,124,006.45;

31.     Attorney's fees and costs incurred in this action; and

32.     Any other and further relief that the Court considers proper;

## On the Thirteenth Claim for Relief

33.     All costs of suit, including attorney's fees and costs, and any other sanctions that the Court deems proper; and

34.     Any and other and further relief that the Court deems just and proper;

## On All Claims for Relief

1.     For prejudgment interest under state law on all fraudulent transfer claims from the date each transfer was made, as set forth in *In re Slatkin*, 525 F.3d 805, 820 (9th Cir.2008), *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 541-42 (9th Cir.1990), and *Field v. Kepoikai* (*In re Maui Indus. Loan & Fin. Co.*), 483 B.R. 346, 353 (Bankr. D. Haw. 2012);

/ / /

/ / /

35

COMPLAINT

4915-5945-1951,v.6

2.      For pre-judgment interest on all other claims at the maximum rate allowed by law;

3.      For costs incurred by Plaintiff in prosecuting this action; and

4.      For such other and further relief as the Court may deem just and proper.


DATED: March 20, 2026                    MARSHACK HAYS WOOD LLP


                                         By: /s/ Chad V. Haes
                                             CHAD V. HAES
                                             Attorneys for Richard A. Marshack,
                                             Plaintiff and Trustee of The LPG Liquidation Trust

36

COMPLAINT

4915-5945-1951,v.6

# Exhibit "1"

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Craig Hunter

 GROBSTEIN TEEPLE

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | ▮4858 | 7/31/2021 | 7/2/2021 | 1004 | 25,000.00 | LALA. CONTRACT |
| | | | | | | **25,000.00** | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management Group, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit "1"
Page 37

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Veritas Investigative Solutions


GROBSTEIN TEEPLE

| Bank Name | Account Name | Account Number | Cardholder Name | Cardholder Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | 4858 | | | 12/31/2020 | 12/1/2020 | 1568 | 140.00 | Invoice #1052 - Gurrola |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 12/31/2020 | 12/1/2020 | 1569 | 140.00 | Invoice #1051 - Lizarraga |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 12/31/2020 | 12/29/2020 | 1584 | 280.00 | Invoice #1054 |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 1/31/2021 | 1/5/2021 | 1624 | 280.00 | |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 1/31/2021 | 1/29/2021 | 1693 | 140.00 | |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 1/31/2021 | 1/29/2021 | 1677 | 140.00 | |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 2/28/2021 | 2/9/2021 | 1735 | 140.00 | Invoice #1071 |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 2/28/2021 | 2/9/2021 | 1703 | 140.00 | Invoice #1068 - Erin Moody |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 3/31/2021 | 3/1/2021 | 1799 | 140.00 | |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 3/31/2021 | 3/15/2021 | 1828 | 140.00 | |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 3/31/2021 | 3/22/2021 | 1869 | 280.00 | Invoice #1066 - Background Check Glient ZADA by, MA |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 4/30/2021 | 4/19/2021 | 1946 | 120.00 | Invoice #1084 - For. Parra |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 4/30/2021 | 4/19/2021 | 1891 | 140.00 | |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 6/30/2021 | 6/23/2021 | 2397 | 25,000.00 | Invoice #1100 - Consultation |
| UnionBank | The Litigation Practice Group PC | 4858 | | | 8/31/2021 | 8/13/2021 | 2843 | 200,000.00 | Separatob |
| Chase | The Litigation Practice Group PC | 3158 | | | 2/28/2022 | 2/10/2022 | | 50,000.00 | Book Transfer Debit A/C: Veritas Investigative Solutions, Irvine CA 92618-1164 US Ref: 1106 Tm: 4563300041Jo |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 6/3/2022 | 5/30/2022 | | 15,000.00 | VERITAS INVESTIGATIVE 000-0000000 TN P.O.S.: 0 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 6/17/2022 | 6/9/2022 | | 15,000.00 | VERITAS INVESTIGATIVE 000-0000000 TN P.O.S.: 0 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 6/17/2022 | 6/13/2022 | | 15,000.00 | VERITAS INVESTIGATIVE 000-0000000 TN P.O.S.: 0 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 6/17/2022 | 6/16/2022 | | 15,000.00 | VERITAS INVESTIGATIVE 000-0000000 TN P.O.S.: 0 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 7/1/2022 | 6/22/2022 | | 15,000.00 | VERITAS INVESTIGATIVE 000-0000000 TN P.O.S.: 0 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 7/15/2022 | 7/4/2022 | | 50.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000020 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 7/15/2022 | 7/5/2022 | | 15,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000021 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 7/29/2022 | 7/18/2022 | | 15,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000022 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 7/29/2022 | 7/25/2022 | | 12,500.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000024 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 7/29/2022 | 7/25/2022 | | 12,500.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000023 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 8/12/2022 | 8/3/2022 | | 30,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000025 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | LPG VC PAN | 4814 | 8/26/2022 | 8/25/2022 | | 20,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000026 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 9/9/2022 | 8/29/2022 | | 10,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000027 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | ROSA BIANCA LOLI | 5870 | 9/23/2022 | 9/12/2022 | | 20,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000036 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | ROSA BIANCA LOLI | 5870 | 9/23/2022 | 9/15/2022 | | 10,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000038 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 9/23/2022 | 9/15/2022 | | 10,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000037 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | ROSA BIANCA LOLI | 5870 | 10/7/2022 | 9/27/2022 | | 20,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000039 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 10/7/2022 | 9/28/2022 | | 10,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000040 SALES TAX: 0.00 |

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management Group, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

1 of 2                    DRAFT FORM - SUBJECT TO CHANGE

Exhibit "1"
Page 38

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Veritas Investigative Solutions


GROBSTEIN TEEPLE

| Bank Name | Account Name | Account Number | Cardholder Name | Cardholder Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|---|
| Chase | LPG; Alex Tarkoff | 0935 | ROSA BIANCA LOLI | 5870 | 10/7/2022 | 9/28/2022 | | 20,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000041 SALES TAX: 0.00 |
| Chase | LPG VC; Alex Tarkoff | 6652 | LPG VC PAN | 4814 | 10/21/2022 | 10/10/2022 | | 15,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000042 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 10/21/2022 | 10/17/2022 | | 10,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000048 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 8494 | 11/4/2022 | 11/1/2022 | | 10,000.00 | VERITAS INVESTIGATIVE YORBA LINDA CA P.O.S.: 000049 SALES TAX: 0.00 |
| Chase | The Litigation Practice Group PC | 3158 | | | 11/30/2022 | 11/16/2022 | | 100,000.00 | Book Trancter Debit NO: Veritac Invectigative Solutionc, Thompconc Station TN 371 79-5386 US Ret Invoice Tm 753700031 9Jo |
| | | | | | | | | **692,270.00** | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management Group, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit "1"
Page 39

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

Strategic Business Partnerships



| Bank Name | Account Name | Account Number | Cardholder Name | Cardholder Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|---|
| UnionBank | The Litigation Practice Group PC | 858 | | | 7/31/2021 | 7/28/2021 | 2650 | 1,009.40 | Invoice #1104 - IT Equipment - Due 7/15/21 |
| UnionBank | The Litigation Practice Group PC | 858 | | | 7/31/2021 | 7/28/2021 | 2649 | 18,087.05 | Invoice #1102 - Background/Overdue Coast PAYPHE. IHeJNDEG DETALS CY WACH |
| Optimum Bank | Coast Processing LLC dba LPG | 738 | | | 11/30/2021 | 11/12/2021 | | 50,000.00 | WIRE TO Strategic Business Partne |
| Chase | The Litigation Practice Group PC | 158 | | | 12/31/2021 | 12/9/2021 | | 50,000.00 | Book Transfer Debit A/C: Strategic Business Partnerships, Yorba Linda CA 92886-4135 US Tm: 691 3200343Jo |
| Chase | The Litigation Practice Group PC | 158 | | | 3/31/2022 | 3/25/2022 | | 25,000.00 | Book Transfer Debit A/C: Strategic Business Partnerships, Nashville TN 37212-3007 US Ret: Partial Payment Tm: 6136600084Jo |
| Chase | The Litigation Practice Group PC | 158 | | | 4/30/2022 | 4/1/2022 | | 25,000.00 | Book Transfer Debit NC: Strategic Business Partnerships, Nashville TN 37212-3007 US Ret: 2ND Half of lnv.1001 -Consulting Tm: 5027600091Jo |
| Chase | The Litigation Practice Group PC | 158 | | | 4/30/2022 | 4/11/2022 | | 25,000.00 | Book Transfer Debit NC: Strategic Business Partnerships, Nashville TN 37212-3007 US Ret: Referral Fees Tm: 4849300101Jo |
| Chase | The Litigation Practice Group PC | 158 | | | 4/30/2022 | 4/21/2022 | | 25,000.00 | Book Transfer Debit A/C: Strategic Business Partnerships, Nashville TN 37212-3007 US Ref: Referral Fees Tm: 402030011 1J0 |
| Chase | LPG; Alex Tarkoff | 935 | WESLEY J THOMAS | 7135 | 5/6/2022 | 4/28/2022 | | 25,000.00 | WPY*STRATEGIC BUSINESS PA 888-659-4961 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 935 | WESLEY J THOMAS | 7135 | 5/6/2022 | 4/28/2022 | | 25,000.00 | WPY*STRATEGIC BUSINESS PA 888-659-4961 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 935 | WESLEY J THOMAS | 7135 | 5/6/2022 | 5/2/2022 | | 10,000.00 | WPYSTRATEGIC BUSINESS PA 888-659-4961 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 935 | WESLEY J THOMAS | 7135 | 5/6/2022 | 5/4/2022 | | 25,000.00 | WPYtSTRATEG IC BUSINESS PA 888-659-4961 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 935 | DANIEL MARCH | 3494 | 6/3/2022 | 5/26/2022 | | 10,000.00 | WPY*STRATEGIC BUSINESS PA 888-659-4961 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | The Litigation Practice Group PC | 158 | | | 6/30/2022 | 6/10/2022 | | 35,000.00 | Book Transfer Debit A/C: Strategic Business Partnerships, Thompsons Station TN 37179-5386 U5 Ref: Referral Fees Tm: 6442100161Jo |
| | | | | | | | | 349,096.45 | |

DRAFT FORM - SUBJECT TO CHANGE

Exhibit "1"
Page 40

In re: The Litigation Practice Group PC                                                    Lark Hill Investments
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

| Bank Name | Account Name | Account Number | Cardholder Name | Cardholder Number | Statement Date | Transaction Date | Credit/Deposit | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|---|---|
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 5/6/2022 | 5/5/2022 | | 25,000.00 | WPYtLAR K HILL INVESTMENTS 855-469-3729 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 5/6/2022 | 5/5/2022 | | 25,000.00 | WPYtLAR K HILL INVESTMENTS 855-469-3729 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 5/20/2022 | 5/9/2022 | | 25,000.00 | WPYLARK HILL INVESTMENTS 855-469-3729 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 5/20/2022 | 5/11/2022 | | 25,000.00 | WPY*LARK HILL 714-586-6311 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | DANIEL MARCH | 3494 | 6/3/2022 | 5/25/2022 | | 10,000.00 | WPY*LARK HILL 714-586-6311 TN P.O.S.: 00000000000000000 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 6/3/2022 | 5/25/2022 | 25,000.00 | | WPYtLARK HILL INVESTMENTS 714-586-6311 TN P.O.S.: 608316407 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 6/3/2022 | 5/25/2022 | 25,000.00 | | WPYtLARK HILL INVESTMENTS 714-586-6311 TN P.O.S.: 608316379 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 6/3/2022 | 5/25/2022 | 25,000.00 | | WPYtLARK HILL INVESTMENTS 714-586-6311 TN P.O.S.: 608316392 SALES TAX: 0.00 |
| Chase | LPG; Alex Tarkoff | 0935 | WESLEY J THOMAS | 7135 | 6/3/2022 | 5/25/2022 | 25,000.00 | | WPYLARK HILL 714-586-6311 TN P.O.S.: 608316437 SALES TAX: 0.00 |
| | | | | | | | 100,000.00 | 110,000.00 | |

DRAFT FORM - SUBJECT TO CHANGE

Payor Accounts: BAT Inc., Coast Processing LLC,
EZ Debt Relief, Maverick Management Group, Prime Logix, The
Litigation Practice Group, Vulcan Consulting Group LLC

Exhibit "1"
Page 41

# Exhibit "2"



P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

**PERSONAL AND CONFIDENTIAL**

Date: August 13, 2021

Craig Hunter
Veritas Investigative Services, LLC

Re:   Separation Agreement and Release

Dear Mr. Hunter,

This will confirm that the retention of Veritas Investigative Solutions, LLC and Craig Hunter as a contractor ("Contractor") by The Litigation Practice Group PC ("Company") will end effective August 13, 2021 ("Separation Date"). The Company wishes to offer you a severance package in connection with the separation of your work from the Company. This letter ("Agreement") sets forth the terms and conditions of the severance package the Company is offering to you.

1.     Termination of Employment.

   1.1.   Your contract and putative employment will terminate for all purposes on the Separation Date.

   1.2.   You agree that you have been paid for past work through today's date in full.

2.     Separation Package.

   2.1.   Separation Pay: If you sign and return this Agreement, the Company will pay you separation pay in the amount of **$1,150,000.00** (the "Separation Pay") The Separation Pay will be given in two parts, first a check in the amount of $200,000.00 at the time of execution of this Agreement, and $950,000.00 either donated to a charity of Contractor's choice or directly to you on the following schedule, provided that no revocation has been received within the meaning of Paragraph 12: You will convey to LPG your choice of disbursement 48 hours in advance of payment date, otherwise disbursement will be to your LLC, Strategic Business Partnerships.

   September 15, 2021: $200,000.00.

   October 15, 2021: $150,000.00.

   November 15, 2021: $150,000.00.

**PERSONAL AND CONFIDENTIAL**

December 15, 2021: $150,000.00.

January 15, 2022: $150,000.00.

February 15, 2022: $150,000.00.

2.2 If any portion of the scheduled payments, including partial payments, are not received within 48 hours of its scheduled date, you have the right to serve a notice of default and the entire remaining balance of this agreement will be immediately due and payable.

2.3 You acknowledge and agree that the release(s) and promises contained in this Agreement are supported by good and valuable consideration to which you are not otherwise entitled. You further specifically acknowledge and agree that the consideration set forth in this Paragraph 2 is and does constitute sufficient consideration to support the release(s) and promises contained in this Agreement.

2.4 In the event there is a permanent closure, sale or transfer of ownership, LPG and successor or creditor will be responsible for full payment. In the event there is no successor, Daniel S. March will be personally liable for any unpaid amounts.

3. Other Benefits.

   3.1. Nothing in this Agreement shall preclude you from filing a claim for unemployment insurance.

   3.2. Other than the amounts/benefits set forth above, you are not eligible for, and will not receive, any other compensation or benefit following the Separation Date.

4. Full Understanding and Voluntary Acceptance. You agree that you understand all the terms of this Agreement. You are executing this Agreement voluntarily with full knowledge of its significance.

5. Confidentiality. You agree that the terms of this Agreement are confidential. You agree not to disclose any information regarding your retention by the Company, the work you performed for the Company, or the business of the Company, without limitation, unless compelled by subpoena. You acknowledge that LPG has a successor relationship with BAT Inc., DBA Coast Processing and that you had a prior contractual arrangement with BAT before BAT was purchased by LPG. You further agree not to disclose any information regarding your prior retention by BAT Inc., the work you performed for the BAT Inc., or the business of BAT Inc., without limitation, unless compelled by subpoena.

6. Return of Company Property; Trade Secrets; Non-Solicitation, Non-Disparagement.

-2-

**PERSONAL AND CONFIDENTIAL**

6.1.  You represent that you have returned all keys and other means of access to the property of the Company, as well as all other Company property, equipment, credit cards, laptops, records and documents in your possession or under your control.

6.2.  You also agree to preserve in confidence and not disclose, either directly or indirectly, any confidential, proprietary, or trade secret information relating to the Company, its products, services or operations including, but not limited to, information related to Company budgets, projections, audits, expenses, marketing and sales policies, employee compensation data/policies, customer lists and customer information. You agree to abide by the terms of any and all confidentiality agreements you signed as part of your employment with the Company, which are incorporated herein by reference.

6.3.  You understand and agree that the representations and covenants made by you and set forth in this Paragraph are essential and material to the Company, and the Company would not have entered into this Agreement except for your representations and commitments.

6.4.  Contractor will not take any action or make any verbal or written statement which disparages the Company. Further, Contractor will not directly or indirectly release any information or encourage others to make any statements, make any oral, written or recorded private or public statement or comment that is disparaging, or defamatory of the Company, or provide any information designed to embarrass, disparage or criticize the Company, provided that it shall not be a violation of this paragraph for Contractor to make truthful statements when required to do so by a court of law, by any governmental agency having supervisory authority over or by any administrative or legislative body (including a committee thereof) with jurisdiction to order him to divulge, disclose or make accessible such information, or in exercising the Contractor's rights under Paragraph 2.

6.5.  Contractor shall not form nor participate in the ownership nor formation of any company that operates in the debt resolution industry, defined as any legal entity whose primary purpose is the elimination or resolution of consumer debt. This shall not restrict Contractor from being employed by such company as a contractor or Contractor.

-3-

Exhibit "2"
Page 44

**PERSONAL AND CONFIDENTIAL**

7.   Release of Claims.

    7.1.   You agree to forever waive and release the Company, and each of its affiliated or related entities, holding companies, parents, subsidiaries, divisions, officers, shareholders, partners, directors, employees, agents, attorneys, insurers, past and present predecessors, successors, and assigns, and all persons acting by, though, under or in concert with any of them (collectively, "Released Parties"), from all known and unknown claims, rights, actions, complaints, charges, liabilities, damages, obligations, promises, agreements, causes of action, suits, demands, costs, losses, debts, and expenses of any nature whatsoever which you ever had, now have, or may claim to have, including, without limitation, any claim arising out of (i) any aspect of your employment or its termination; (ii) any agreement, oral or written, express or implied, between you and any of the Released Parties, including, without limitation, any employment agreement; (iii) any common law or statutory torts; (iv) any federal, state or governmental constitution, statute, regulation or ordinance, including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Family and Medical Leave Act, and the California Fair Employment and Housing Act; and (v) any claim for salary, wages, commissions, bonuses and/or any other compensation or benefit.

    7.2.   Further, you waive and relinquish all rights and benefits you may have under Section 1542 of the California Civil Code, which reads as follows:

> "A General Release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the Release, which if known by him or her must have materially affected his or her settlement with the debtor."

    7.3.   The waiver and release in this Agreement does not apply to those rights which as a matter of law cannot be waived.

8.   Non-Admission. Nothing contained in this Agreement shall be considered an admission of any wrongdoing or liability whatsoever by either you or the Company.

9.   Severability. Should any clause, sentence or paragraph of this Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected.

10.   Governing Law. This Agreement is made and entered into in the State of California and shall in all respects be interpreted, enforced and governed under the laws of said State. To the fullest extent allowed by law, any dispute regarding your employment with the

-4-

**PERSONAL AND CONFIDENTIAL**

Company or its termination, any aspect of this Agreement or any act which allegedly has or would violate any provision of this Agreement, shall be settled by final and binding arbitration in the county of your employment with the Company, in accordance with the applicable rules of JAMS, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

11.    Entire Agreement. This Agreement constitutes the entire integrated agreement between you and the Company pertaining to its subject matter and supersedes any and all prior agreements, understandings, negotiations and discussions, whether oral or written, pertaining to the Agreement's subject matter. Any modification to this Agreement must be in writing and signed by both you and the Company.

12.    Signature and Revocation Periods. So that you can review this Agreement as you deem appropriate, the Company advises you as follows: (i) this Agreement does not waive any rights or claims that may arise after it is signed by you; (ii) you will have twenty-one (21) days to consider this Agreement, although you may sign it sooner than that if you so desire; (iii) the Company hereby advises you in writing to consult with an attorney before signing this Agreement; and (iv) you also retain the right to revoke this Agreement at any time during the seven (7)-day period following signing of the Agreement. This Agreement shall not become effective or enforceable until such seven (7)-day period has expired ("Effective Date").

If the terms of the separation package as set forth above are acceptable to you, please date and sign this Agreement below and return it to me so that we can process the check for your Separation Pay once the seven-day revocation period has passed. If you have any questions regarding the separation package, or any aspect of your employment, please do not hesitate to contact me personally.

Sincerely,

_____    8-13-
Daniel S. March, LPG        Date
LITIGATION PRACTICE Group. P. C

I HAVE READ, UNDERSTAND AND VOLUNTARILY AGREE TO THE ABOVE:

_____ Veritas Investigation    8|13|21
Solution        Date
Craig Hunter on behalf of himself and

-5-